Good morning, Your Honors, and may it please the Court. I'm David Becker for Appellants, Oregon Natural Desert Association, and the Center for Biological Diversity. With me at the council's table are Stephanie Parent and Mac Lacy. I'd like to reserve four minutes of my time for rebuttal. The issue here is whether the Forest Service's annual operating instructions are final agency action under the test in Bennett v. Speer. And I'd like to focus on how the annual operating instructions satisfy the second part of the Bennett test, because that seems to be where most of the dispute is in this appeal. Under Bennett, an agency action is final if it marks the consummation of the agency's decision-making process and if the resulting decision determines rights or obligations or has clear and appreciable legal consequences. Annual operating instructions are final agency action because they mark the end. Counsel, before you get right there, do you consider the permits to be final agency actions also or not? They also are final agency actions. Idaho Watershed Project has stated as much. So if no AOIs were issued, could they run cattle? As a practical matter, Your Honor, no, I don't think they could because the permits I'll take a step back and describe the interaction of the permits and the annual operating instructions. The permits in this case or in these cases were all issued before 1995 originally. And in 1995, the Forest Service incorporated the in-fish and pack-fish grazing standards into the Forest Plan. However, in 1995, Congress also passed the Rescissions Act, Section 504 of which and subsequent appropriations riders have provided that the 10-year term grazing permits, as they expire, must be renewed on the exact same terms and conditions as they were originally issued as long as the Forest Service has not conducted a NEPA analysis of the conditions of the grazing. And on these eight allotments, the Forest Service has chosen not to conduct environmental assessments under NEPA. As a result, the terms of the original permits have been continued and they have not incorporated the pack-fish and in-fish grazing standards. Instead, it's the annual operating instructions where the Forest Service is making its determination as to whether or not the grazing that it authorizes is consistent with the Forest Plan, is consistent with in-fish and pack-fish, and is consistent with the Forest Service's obligation under the Endangered Species Act not to authorize actions that would jeopardize the continued existence of the threatened steelhead and bull trout. I think that might be a little different from what I'm asking. Maybe it's not. Maybe I'm just not catching it. What I'm saying is, assuming for the moment that the Forest Service doesn't issue AIs, you know, they go to sleep, they do whatever they do. These folks have permits that say they can run so many cattle between this date and that date. Now, of course, they're not supposed to be destroying the environment. I mean, they're going to have to maybe use their own heads on how long they let them graze and where they're grazing and that sort of thing. My question is, if the Forest Service never issued the AOA, never gave them instructions, here's what we say you guys ought to do, then what is it in the permits that indicates that they can't run their cattle? In the permits, it states that the permits are subject to the instructions of the Forest Service. In this case, yes, and I'm saying assume for the moment the Forest Service doesn't instruct because the Forest Service just sits there. I'm sure they're subject to the instructions of the Forest Service, let's say. Let's say don't instruct so no new instructions come down. Again, I think it's a practical matter, Your Honor, the Forest Service is obligated to instruct. I want to be practical. I want you to come into the universe of impracticality that I live in sometimes and just tell me, if the Forest Service doesn't do what you think and maybe we think it ought to do, can they run their cattle? Is there a permit? There's a permit. They can run cattle. No instructions have come down. Nothing says you can't go in this unit or that unit. Nothing says you can't take 45% of the grass. Nothing says anything. They just have a permit so they can run cattle. Can they do it? I don't think so, Your Honor. I think that there is the permits only set the general levels of allowable grazing, and they contemplate on their face that there will be annual operating instructions or something similar, or originally annual operating plans on the permits, to make sure that the conditions of actual grazing conform to the Forest Plan standards. In fact, in the Blue Bucket Allotment, one of the permits specifically stated, we'll be using the annual operating plans to bring grazing in conformance with the Forest Plan. So I think that the grazing under the permit that is not in compliance with the Forest Plan would not be possible. So what could have been permitted? The permit, as we described in our briefs, and as Public Lands Council, the Supreme Court has said, establishes a general preference to graze a particular area of public lands as opposed to any other person. The grazing permit also sets maximum upper limits of estimated grazing, an estimate of what the particular allotment might be able to sustain. But again, the permit on its face contemplates that that maximum limit can be adjusted for conditions of resources and also for changes in law. I think the question is a little different, though, if I understand the question. Maybe it's something like this. Is there a provision in the grazing permit, something to the effect that says, this permit cannot be used without an AOI? No, there's nothing that states that that expresses. So in other words, then isn't the answer to Judge Fernandez's, I think his first question, if there is no AOI, the permit holder can still graze cattle pursuant to the permit because nothing prohibits that. And he has a permit. Again, the permit on its face suggests that grazing that occurs... No, I'm not talking about suggestions. Suppose a permit holder did not receive an AOI and, you know, put his cattle out to that allotment. Would he be in violation of some law or the violation of the permit? In violation of the requirement in the permit that the grazing be conducted consistent with the forest plan. Well, what if he conducts it? This cattleman has brilliant environmentalists working with him and such, and he conducts it in accordance with not only the forest plan but with some cosmic forest plan that's even better and protects everything even more because this person really, really, really wants to protect the environment. He wants to feed his cattle, but he wants to protect the environment. But he has no permit, but he has no AOIs. So he does no harm. He's like a physician. He does no harm. He goes in there and does no harm. But he has no AOIs and no other thing, no other piece of paper from the Forest Service. He just runs his cattle according to the permit. Anything wrong with that? I think that in practice, again, the Forest Service is issuing these AOIs. They're doing it every year because they have an obligation. And they're going to continue to do it. There's no indication that the Forest Service will not issue annual operating instructions because it has the obligation to do so to make sure that the grazing is conducted in compliance with the forest plan and with the Endangered Species Act. And I think the Forest Service would have an obligation if it didn't issue an AOI to still stop grazing because it hasn't made that determination on a year-to-year basis of whether the grazing that's going to occur is going to be consistent with the forest plan and with the Endangered Species Act obligations on these particular allotments. I think that the critical point here is in determining whether these annual operating instructions which have occurred are final agency action is whether or not there's been a decision-making process, whether the decision-making process came to an end, and then whether or not the result of that process places legal obligations or has direct legal consequences for the permittees who are subject to the action. And on all of these allotments for all of the years at issue here, the Forest Service has issued annual operating instructions which have marked the end of the decision-making process that has involved consultation under the Endangered Species Act that has made the decision of how much grazing to authorize that particular year, under what conditions and restrictions that grazing is going to occur during that year. And through the AOIs, they've determined binding obligations that are different from those in the underlying permit. They've done this both by setting levels through the AOIs that are more restrictive than the underlying permits in terms of the number of livestock and the seasons of use. They've done this by imposing mitigation measures to protect the threatened fish that are affected by this grazing. If I understand it, they can't reduce the number of livestock except in emergency without giving a one-year notice, correct? That's in terms of formally modifying the permit. That's what the regulations provide. However, in practice, they have done exactly that every year. What if the permit holders squawk? They say, you know, we're going to reduce the number of cattle you can run, period. Not on just one unit in the allotment. We're just going to reduce it, period. We're knocking it down to 25 instead of 150. And that's what they say. And the person squawks because they're always signing on and saying, okay, okay, okay, okay. But suppose they squawk. They say, no, wait a minute. You can't reduce it. You haven't given me a year's notice. That would be a final agency action, and that would be subject first to an administrative appeal potentially. But certainly they could challenge that in court because it meets the Bennett Standard. You talked a couple times about practicality. If indeed each time they issue an AOI, AOAs, I gather, are also subject to adjustment at any time along the way. There's nothing final about them in that sense. But if they issue, just assuming that. So here are the AOIs that are adjustable. Are they final if they're adjustable? Yes, they are, Your Honor, because the analysis in Bennett looks at the point where the decision is rendered initially. And at that point, there's finality. The fact is any agency decision, any law, even the Constitution is subject to being changed. The D.C. Circuit has addressed this very question in a couple of cases, in Appalachian Power v. EPA, in General Electric v. EPA, and have said that once the agency has issued its final word, that is a final action, even if it is subject to later change. And is each later change also a final action then? If it meets the standard under Bennett that there's been a decision, then. Practically speaking, you're talking about practicality. If every time they issue an AOI, it's subject to appeals, court proceedings coming to us, all those kinds of things. How does one, practically speaking, run cattle under that kind of regime? What has to be done in those circumstances is the Forest Service has to be making its decisions appropriately so that they're- Well, sure, but, you know, it'll surprise you to hear that sometimes they make a decision, and they think it's appropriate, and so do a lot of other folks, but a lot of other folks don't think it's appropriate. The ones who don't think it's appropriate are the ones who are going to bring the action. Nothing wrong with that. But I'm just asking, practically speaking, how do you graze cattle under that regime? The fact is that these challenges to annual operating instructions are, or any decision of an agency, they're so fact-intensive, and they are a drain on the resources of organizations. It's very unlikely that any organization is going to be able to challenge more than a handful, such as the, in this case, eight allotments on a single national forest, one-tenth of the allotments on this particular national forest. Yeah, but I'm a businessman, let's say, or a cattleman, and that's nice. This might be my year for lightning, but it's kind of hard to run a business if every year I have to be concerned that my allotment's going to be challenged in court. I'm just asking, if that were the case, then, of course, I can't really plan that well, or can I? You can plan according to the AOIs that come out, as long as they're being, as long as the Forest Service is going through the proper process to develop them, there's not likely to be any sort of a challenge. And in the, and I think as a matter of, again, the Bennett test, the fact that there are effects from the AOI on the day-to-day operations of the business because they have to adjust to reductions from the terms of the original permit, fewer livestock can be run, shorter seasons of use, the need to comply with the terms of the individual annual operating instruction, show that the AOIs do have the requisite finality under Bennett to be final agency action. Let me ask you this. I was kind of surprised when I read the cases that there really hadn't been a court of appeals case that particularly addressed this issue. What's the best case you've got that supports your position? I think there are two lines of cases that intersect here. First of all, the annual operating decision itself, the nature of it, is exactly like the timber sales that are authorized by the Forest Service where they apply forest plan resource protection requirements to a site-specific activity by a private individual. And these cases have been, and in cases such as Neighbors of Cuddy Mountain and the cases cited therein, timber sales have been held to be final agency action. At the same time, this is an iterative decision process. So a case in this court, Alaska DEC, and the All Steel and City of Tacoma cases from the other circuits, which we cite in our reply brief, indicate that where you have an underlying license or permit and there's a subsequent agency decision that relates to the particular permittee and results in a different decision-making process, new obligations being imposed on that permittee, or a determination that rights of the permittee are restricted, then you have another final agency action. And what those cases stand for is the proposition that where you have a long-term project, such as a 10-year grazing permit, it's possible to have a series of final agency actions. If there are no other questions, I'd like to reserve my time. That's fine. Good morning, Your Honors. Jennifer Sheller for the Forest Service. With me at counsel's table is Ms. Karen Budd-Allen, and I'd like to reserve five minutes of my time for her to use. As this court and others have recognized, the implementation of a final agency action is not itself challengeable under the Administrative Procedure Act. This appeal presents the question of what side of that line, final agency action or implementation, these annual operating instructions fall on. And because both district courts here got it right, these are not final agency actions, on as complaints were correctly dismissed for lack of jurisdiction. First, these operating instructions aren't agency actions. They're tools the Forest Service uses to implement the existing standards in the Permits, Forest Plan, and Endangered Species Act consultations. Why don't you address Judge Fernandez's question? Which one, Your Honor? The one that he started out with. Could the cattleman, if they just had the permit, without an operating instruction, run the cattle on the allotments without facing any consequences? I talked to the Forest Service about this, and Judge Fernandez is right. There's nothing in either the permit, in the statute, or the Forest Service's regulation that requires them to issue these operating instructions. Certainly, they're allowed to under the terms of the permit. They say the permitee must follow the instructions of the Forest Service. If there's nothing that requires an OAI to be issued, but there is some regulatory authority that authorizes it, although not requires it? The authority really comes from the permit itself, which tells the permittee that they have to comply with instructions from the Forest Office. And it doesn't specify exactly what that is, but that would include both the written annual operating instructions that come out at the beginning of the grazing season, as well as oral instructions given by range officers throughout the season. If it's authorized by the permit and issued under the permit, doesn't it itself then become a part of the permit, which makes it agency action? I don't think so, Your Honor. Certainly, that's what ONDA attempted to argue in their brief, but I think that they're really seen as sort of translating the existing standards in the permit into terms of this is how we project we'll be able to run your cattle in this particular grazing season, given the condition of the resource. Do these AOIs, in fact, sometimes limit the number of cattle that can be run below the number specified in the permit? Yes, sometimes. Well, isn't that like an amendment to the permit? It's something other than what the permit authorizes. In fact, it's quite the contrary. It is what the permit authorizes in this sense. The permit itself incorporates those utilization standards that the permittee cannot exceed whenever he's running his cattle. And so while it is a change in the numbers and a more detailed description of where on the allotment the permittee will be at any time during the year, that is all ñ it's not a separate decision-making process in this is how many cattle we think we should have on the range. So if the number of cattle is reduced, that can't be challenged because there's no agency action, even by the permit holder. I think that that's probably right because the permit itself sets out the utilization standards and these annual operating instructions are the implementation of that standard. The Forest Service working with the cattlemen, gathering the information that they've taken in through monitoring, predicting what the conditions on the range are going to be throughout that next grazing season, and telling them where on the range they should be. And also, of course, the Forest Service has a responsibility to manage the multiple permittees that are on the allotments and making sure that they're all sort of in different places at different times. What are the cattlemen supposed to do if they disagree with the restrictions imposed by the Forest Service and the AOI? He can't challenge it? Well, the annual operating instructions state specifically that if you think you can be on a particular pasture longer, just notify the Forest Service, we'll come out and look at the condition of the range and make a decision based on the condition of the range. And suppose they still say no? That's not a final agency action that's subject to challenge? I really don't think that it is. Could the cattlemen be prosecuted if you violated the AOI? Violations of the AOI, depending on the severity of the Forest Service, can certainly collect for unauthorized use. There would be a higher rate of payment that the cattlemen would have to make. They may have to pay a higher, like a penalty? Not really a penalty. Well, I suppose in one sense a penalty, because it is a higher rate than they would normally have to pay. And also if the Forest Service chooses, they could take an enforcement action and suspend part of the permit, which is an example of that. That would invoke another whole process. That's right, and that would certainly be subject to challenge, both internally through administrative appeal processes. But what if the Forest Service didn't take any action? If the Forest Service didn't take any action? And the cattleman was still upset with the restrictions imposed on the permit? He just has to live with it? I think, I mean, if the Forest Service isn't actually taking any action, then I suppose the cattlemen wouldn't have to live with it. Suppose he limits, like Judge Schumann just asked, suppose the Forest Service limits the number of calves, and the rancher is dissatisfied with the cattle, and thinks that he should be able to run more cattle up to the permit limit. He can't challenge, you're saying he can't challenge that decision. That's what you said a minute ago. I think that that has to be right. I mean, this is not something that's been litigated and tested at all by the cattle ranchers. The normal course is that the agency is able to develop a rotation schedule and numbers of permitted cattle that is agreeable to both the Forest Service and the ranchers. Speaking of non-litigate, let me ask you the question that Judge Paz asked Mr. Becker. What is the best case that supports your position that the AOI is not either an agency action or a final action? From this court, I think the best case is Montana Wilderness, the portion talking about ongoing trail maintenance activities. And that's really something quite similar to what we have here. ONDA is trying to take these annual operating instructions out of context a little bit. This is just one part of the fluid process that the Forest Service goes through to manage the range throughout the 10-year lifespan of the permit, much like the process of maintaining certain trails and doing work to them that this court said was not a challengeable final agency action in Montana Wilderness. I think the other case ... I'm sorry, I didn't catch the name of the ... Montana Wilderness. The other opinion that I think is most useful is the Tenth Circuit's opinion in the chemical weapons case that cited in Embree. And there the court makes clear that the implementation of a final agency action is not itself challengeable. And certainly any time there is an agency action, it's not going to spell out precisely what dates and what times certain things are going to occur. That's all going to have to be defined with further detail as the action is actually implemented. And I really think that that's what we have going on in this case. Onda suggested a comparison to the timber sale scenario. But I think, as Judge Jones explained in footnote 8 of his opinion, the real comparison between grazing and timber sales is the permit is like the decision notice that comes out in a timber sale situation. And the annual operating instructions are like the instructions that the agency gives to the timber contractor as they are harvesting the timber. And you wouldn't say that that would be a challengeable final agency action. That's not the consummation of the decision-making process. That's just agency oversight of the decision that has already been made. You know, the test in Benda v. Spears for final agency action had two parts. The consummation was the first part. Is it your contention that they fail at the first step of the test under Spears for final agency action? Yes. Or the second part, that the action must be won by which rights or obligations have been determined or from which legal consequences will flow? Which is your — it's not a consummation of a decision-making process, or no legal rights or responsibilities flow from it, there's no consequences. What is your position? I think it's both, Your Honor. Because on the first prong, the consummation of the decision-making process, that process was already consummated with the issuance of the permit that has the substantive utilization standards and puts the sort of outer limits on the time frame and the number of cattle that can be grazed. Likewise, there aren't really rights or obligations that are flowing from the AOIs. That, again, is all coming from the terms of the permit and the decision that was made there to authorize grazing under certain conditions. And these annual operating instructions are just the implementation of that process. Let me take you back just one point on the legal consequences. You know, we had a case called — it was a criminal case. As I recall, it was on — involved the prosecution of a cattleman who violated the terms and conditions of his permit. One of the allegations was not only did he violate the terms and conditions of the permit, but he violated the operating instruction as well. And it was used as part of the overall enforcement mechanism. Why doesn't that sort of show that there are legal consequences that can flow from the annual operating instructions? Well, it is true that the Forest Service can use, you know, being on the range longer than what is laid out in the operating instructions as part of an enforcement action. But, again, the consequences aren't from the annual operating instructions. They are from the permit itself, which gives the reasons for why those time limits are placed on the grazing, which is to preserve the condition of the resource and to make sure that all of the substantive — So what are they, then? How do you characterize them? They're just tools? They are tools that implement the final agency action, which is the permit. That don't reflect a consummation of any decision-making and don't have any separate standing legal consequences. That's right. And the best case for that proposition is? I still think it's Montana Wilderness and the Tenth Circuit's chemical weapon case. Chemical. And, again, just because there's always going to be some level of detail that needs to be filled in as the agency is implementing the action. And that's really what we have going on here, is just filling in the levels of detail. I'd also like to make an observation about what Onda was arguing in the district court. What they're seeking here is not a change in the rotation schedules that are laid out in these operating instructions. They really want to stop grazing on these allotments for the next 20 to 30 years. And that is a goal that is, frankly, more appropriately pursued by challenging the issuance of the permit in the first place. To be honest, I really haven't looked at the merits of their underlying claim. This was knocked out on a jurisdictional basis. That's right. But I just wanted to make clear that this is not a situation where, you know, they're looking for a tweaking of what's going on in the annual operating instructions. They really are after complete succession of grazing, which is a permit-level decision, certainly. Well, that's not really a merits question. It's a question of what you ought to do is attack the permits when they're issued. If you don't want them to get grazing there for 30 years, you should not let the permits be issued if you can stop it. That's right. Like the timber sale. You should stop the sale if you don't want timber taken to stop the sale. That's right. Let me ask you another thing. I'm getting a little bit confused about the lowering the number of cattle. How does that tie in with the regulation about you can only do it, you can only lower the number by giving one-year notice? Is the distinction simply the AOI versus amending the permit? Certainly the Forest Service uses different terminology to describe what they're doing. But whenever they're modifying a permit pursuant to the regulation, that is really a change in the substance of what the cattleman is authorized to do under the permit. So, for instance, there's an example in our supplemental excerpts that includes fencing off a portion of the allotment, and the cattleman is expected to keep his cattle out of that area. That is a modification to the permit that went through the one-year notice process. These annual operating instructions, on the other hand, are not modifying the permit in the sense that they're changing any of those utilization standards as far as how much grazing can go on, how much use of the resource can go on. All of that is already laid out in the permit itself, and the annual operating instructions are merely implementing that already consummated decision-making process. What would happen if the AOI raises the number of cattle over the number in the permit, which sort of smells like happens once in a while? There is some reference in the record to that happening by mistake at some point, but it's not supposed to happen. I'm not sure if this was clear in our briefs, but the numbers and grazing season and the permits are translated into animal unit months. Right, yes. Okay. And so the annual operating instructions, at least, are not supposed to exceed that total annual unit month. So they may decrease the time and increase the number of animals as long as the AUM stays the same? That's right. That's right. Unless there are any further questions, I do want to... May it please the Court. Excuse me. My name is Karen Budd-Fallon, and I represent the cattlemen in this case. I think it would be helpful to the Court if I explained exactly how these annual operating instructions come about and what happens when the cattlemen do agree with the Forest Service. The annual instructions are created every year during annual operating meetings that the Forest Service has with each grazing permittee who wants to turn cattle out on the forest land. The permittee and the Forest Service, their particular range conservationists, sit down and they talk about things like, you know, we've had a lot of moisture in this pasture, you can use this here, we've got problems in this pasture, don't use this till later. And they're actually a negotiated document. If the permittee disagreed with how the Forest Service wanted to come out in the end on the annual operating instructions, the permittee could say no. If the Forest Service decided that it wanted to enforce the annual operating instruction and enforce the permittee to take a reduction in numbers or a shortening of the season of use, the only way the Forest Service could enforce that is to issue a final decision against the term permit, which the permittee could appeal through the normal administrative appeals process. That's the way those decisions are worked. And so this idea in Onda's briefs and is discussed about how the Forest Service actually reduces the numbers in an AOI, those are negotiated decisions. That's how these AOIs are set up. It's not a Forest Service coming out and telling the permittees you can't turn out a certain number. If the Forest Service truly wanted to enforce that and the permittee truly disagreed and wanted to graze the full numbers in this term grazing permit, the Forest Service would have to issue a final appealable decision against the term permit, and then the permittee or anybody else could go through the appeals process outlined in 36 CFR 215 or Part 251. Kennedy. You say term decision. Do you mean that they would actually have to modify the permit? That is correct, Your Honor. That's because the AOIs are negotiated. So an AOI is never issued except when the permit holder agrees. Is that right? That is correct. The permittee and the Forest Service come up with a negotiated agreement on that year. Now, once an AOI is agreed to, does that become some kind of an enforceable instrument? The enforcement, as has been explained, is against the term grazing permit. His Honor brought up the Anchustige case, which was the criminal process. Is the answer yes, it becomes enforceable? No, the enforcement is, again, against the term grazing permit. So there's no consequence to violating an AOI condition? Well, what happened, Your Honor, is that it was, as this Court recognized in the Anchustige case, is that if you violate an AOI, the Forest Service issues against you what they call a notice of noncompliance, or NONC, that says, you know, you graze your cattle longer, you have more cattle, you know, whatever it is that they claim is violating the annual operating instructions and the permittee is giving a chance to cure. If the Forest Service doesn't think that the permittee cured it in the right way or the Forest Service thinks that there were so many violations that it needed to take action against the permittee, the action would be against the term grazing permit to either reduce or suspend part of the season of use or part of the numbers or cancel the permit altogether. So if it ever gets to the stage where some kind of a formal enforcement action is required, it's always an action against the permit and not against the AOI. Is that what you're saying? That is correct, Your Honor. Now, but the violation would be, even though it's an action against the permit, would be for a violation of the AOI. It would be the same as if the Forest Service just called the permittee on the phone and said, I think you're reaching utilization standards. Please move your cows without ever even modifying the AOI. If the permittee said, no, I don't want to do that again, they'd issue what these notices of noncompliance, NONCs, and if the permittee still didn't comply, then the legal action would be against the permit. So that seems to tell me then that the provisions of the AOI become a part of the permit. In other words, say if the permit reduces the number of cattle that can be run on a specific allotment, right, and the permit holder violates that condition, and these informal enforcement efforts are not successful, ultimately the Forest Service would have to go against the permit, right, for a permit violation. Is that right? Yes. But the violation is really a violation of the AOI because the AOI is the document that sets the number of animals that can be run on an allotment. So in that sense, the AOI becomes a part of the permit, doesn't it?  There are some documents, there are some of the administrative record that says that they're part of the permit. There are some parts of the AOIs that says that this simply implements the permit. I think it depends on which part of the excerpts of record section that you read. Thank you. Thank you. That's not an easy question. I'd like to address three things. An illustration of the obligations that flow from an annual operating instruction, this notion of merely implementing, and the point about utilization standards set through AOIs. In the blue bucket allotment in the first of the cases here, in the excerpts of record at 149 to 152, there is a notice of noncompliance and a subsequent noncompliance action, and the Forest Service in there cites three violations of terms of the 2004 AOI that don't appear anywhere in the underlying permit. First of all, they cite it as a violation and penalize the permittee for having livestock on the forest after July 10th, even though the underlying permit would have allowed grazing until September 30th. The utilization standards are also indicated to have been violated, and utilization standards include terms on the 2004 AOI, such as the ESA consultation requirements, which come out of the decision-making process that sets the AOI in consultation with Fish and Wildlife and NOAA Fisheries. Third, they cited a violation of the rotation schedule as another reason for penalizing the permittee, which again flowed from the 2004 AOI. The notion that AOIs merely implement the prior permit decision does not magically take them out of the Bennett test. Instead, the AOIs are a separate decision-making process where the Forest Service is revisiting key terms, such as the number of livestock, the season of use, and going back and making new obligations independent of the terms of the original permit. The cases that the government cites here did not involve this sort of revisiting of an earlier decision or a new decision-making process. As I mentioned, the ESA consultation requirements are a utilization standard set in the AOIs that do not appear in the permits. The AOIs are a consummation of a decision-making process that involves ESA consultation. They create enforceable obligations beyond those in the permits, and the Forest Service in practice monitors for, compliance with, and enforces compliance with the AOIs, therefore their final agency action. Can I ask one question? You're challenging the AOIs that by this time have expired, right? We have, yes. Or the seasons for which they applied have gone past, yes. Gone past, so they're no longer in effect. That's right. So, I suppose you're proceeding under the capable of repetition now, line of argument, is that right? Capable of repetition and also that there is still effective relief available, because if there was a violation three or four years ago, there could be three or four years of rest in the future, if that's what's needed to get the relief we've asked for, which is the achievement of the riparian management objectives. We haven't set, we have not asked on the merits for a certain period of relief. We've asked for an injunction until the riparian management objectives are met. Thank you. Thank you. Thank you, counsel. We appreciate your arguments. It's a difficult case. Thank you very much. The matter will be submitted and will be in recess until tomorrow.
judges: Fernandez, Tashima, Paez